**THE SCOTTS COMPANY, Plaintiff,**

v.

**CENTRAL GARDEN & PET CO., Defendant.**

**No. 2:00–CV–755.**

United States District Court, S.D. Ohio, Eastern Division.

March 20, 2003.

William J Pohlman, David Stewart Cupps, Vorys Sater Seymour & Pease, Columbus, OH, Harold A Barza, Kent J Bullard, Edith Ramirez, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA, Kevin S Reed, Quinn Emanuel Urquhart Oliver & Hedges LLP, New York, NY, Diane M Doolittle, Quinn Emanuel Urquhart Oliver & Hedges LLP, Redwood City, CA, for plaintiff.

John Patrick Gilligan, Schottenstein Zox & Dunn, Columbus, OH, Jesse William Markham, George A Yuhas, Jan E Ellard, Orrick, Herrington & Sutcliffe, San Francisco, CA, Thomas Bright, unknown, Linda M Alioto, Alioto & Alioto, San Francisco, CA, for defendant.

### OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court for consideration of several pending motions. For the reasons that follow, Plaintiff Scotts' Motion to Alter or Amend the Judgment on Defendant's Claim for Incentive Compensation (Doc. # 196) is granted; Plaintiff Scotts' Motion to Alter or Amend the Judgment to include Prejudgment Interest and for Awards of Costs and Fees (Doc. # 197) is granted in part and denied in part; Defendant Central's Motion for a Partial New Trial on Count Ten and for a New Trial on Count Eleven of its Counterclaims (Doc. # 199) is denied. Defendant Central's Motion for Prejudgment Interest (Doc. # 200) is granted. Finally, Scotts' Motion to Exclude and Strike Evidence of Alleged Bad Faith or Unfair Business Practices (Doc. # 185) is denied as moot and Scotts' Motion for Discovery Sanctions (Doc. # 139) is denied as moot.

### I.

This case is brought pursuant to the Court's diversity jurisdiction, 28 U.S.C. § 1332, as an action on account and for breach of contract arising from the claims and counterclaims of Plaintiff Scotts Company ["Scotts"] and Defendant Central Garden & Pet Company ["Central"], a distributor of Scotts' products. After a four week jury trial, Plaintiff Scotts' received a verdict in the amount of $22,500,000.00 on its claim for breach of contract; Defendant Central received a verdict in its favor in the amount of $10,975,000.00 on its claim for breach of contract for payment of agency fees and excess shipments; and Defendant Central received a verdict in its favor in the amount of $1,100,000 on its claim for breach of contract for incentive compensation ($750,000.00) and Miracle–Gro® subject to right to return ($350,-000.00).

This matter is now before the Court for resolution of a number of post-trial motions.

### II.

**A. Plaintiff Scotts' Motion to Alter or Amend the Judgment on Defendant's Claim for Incentive Compensation**

Scotts moves pursuant to Fed.R.Civ.P. 59(e) to Alter or Amend the Judgment insofar as it reflects an award of $750,000.00 to Central from Scotts for In-

centive Compensation. Scotts argues that recovery on the claim is improper because Central did not plead a claim with respect to its alleged right to receive a 5% incentive payment for buy/sell sales of Ortho ®/Roundup ® products for Program Year ["PY"] 2000. Counsel for Central made reference to the claim in opening statement and also sought an entry on the verdict form for the claim during the jury instruction charge conference. As Scotts points out, this Court allowed the issue to be presented to the jury but indicated that it would more fully consider the issue post-trial. Central opposes the Rule 59(e) motion on the basis that the evidence presented conforms to a claim for incentive compensation. Central further argues that Scotts' motion is improper because Scotts failed to move for Judgment as a Matter of Law under Rule 50(a) at the close of evidence in this case.

Central's purported claim for incentive compensation is derived from Plaintiff's Exhibit 19, Scotts' term sheet for buy/sell sales of Ortho®/Roundup® products to distributors such as Central in Program Year ["PY"] 2000. The exhibit provides, in relevant part:

2000 Distributor Buy/Sell Trade Program effective dates: October 1, 1999 to September 30, 2000.

Buy/Sell Distributors will receive an off-invoice price rollback on all buy/sell product purchases in program year. The 2000 buy/sell distributor price rollback is a program element exclusive to this class of trade. It should not be interpreted as an across-the-board price reduction.

2000 Program Year

| | | |
|---|---|---|
| Buy/Sell Off–Invoice Price Rollback | | 5.00% |
| Terms/Anticipation | *minimum* | 2.53% |
|      Early Payment (see schedule below) | | |
| Earned Incentives: | | |
| Sales Support Incentive: | | 1.00% |
| Sales Growth Incentive: | | 3.50% |
|     10.00% minimum Growth Goal—Overall | | |
|         Roundup:    suggested +15% | | |
|         Ortho:      suggested +10% | | |
| Ortho Pro Program Support Incentive | | 0.50% |
| | | |
| Total Compensation | | 12.53% |

(Plaintiff's Trial Exhibit 19).

As Scotts points out, the program applies to buy/sell purchases made by distributors in PY 2000. There are three separate incentive programs listed on the term sheet, which collectively total 5%.

Scotts contends that the undisputed evidence at trial was that all of the Ortho® /Roundup® product Central purchased from Scotts in PY 2000 was sent to agency customers, meaning that Central made no purchases in PY 2000 for the buy/sell business.[1] Thus, Scotts argues that Central is not entitled to any distributor incentives. In addition, Scotts points to the testimony of one of its representatives, Mr. Todd White, who testified that Central "refused to report any—give us any information on

1. As explained in more detail in this Court's previous *Opinion and Order* dated April 4, 2002, Scotts manufactures lawn and garden products which were distributed under two general arrangements with Central. A "buy/ sell" sale involves a purchase of the product by Central; an "agency" sale include a pre-arranged sale to a customer, which Central then serviced.

buy-sell sales for [PY 2000]." (April 11, 2002 transcript at 186). As Scotts points out, the only evidence pertaining to Central's buy-sell sales for PY 2000 was a conclusory statement by Mr. Brown that he believed Central's sales were "about $15 million." (April 22, 2002 transcript at 148).

Central relies on Brown's testimony in support of its claim, arguing that the testimony fills in the missing sales figures gap. Central further argues that there is evidence in the record that Central used the $35 million in inventory it had at the start of PY 2000 to service agency customers. Thus, Central argues that there is a basis from which the jury could have found that Central made $15 million in buy/sell Ortho® /Roundup® sales during PY 2000. Central also contends that Scotts' use of Rule 59(e) at this juncture is inappropriate because Scotts failed to make a Rule 50 motion at the close of evidence at trial. The Court considers this issue first.

■ Rule 59(e) provides: "Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." The Sixth Circuit holds that motions to alter or amend judgment may be granted "if there is a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent

manifest injustice." *GenCorp, Inc. v. American International Underwriters,* 178 F.3d 804, 834 (6th Cir.1999) (internal citations omitted). The district court enjoys considerable discretion in determining the merits of a Rule 59 motion. *Davis v. Jellico Community Hospital,* 912 F.2d 129, 132–33 (6th Cir.1990).

In this case, Plaintiff Scotts' motion is premised on the notion that manifest injustice will result if Central is permitted to recover on the jury's verdict of $750,000 in incentive compensation for buy/sell sales. Central argues, however, that Scotts' motion under Rule 59(e) is, in reality, a Rule 50(b) motion, which is made after the verdict is returned. Further, Central contends that such a motion is inappropriate because Scotts failed to make a Rule 50(a)[2] motion at the close of evidence, prior to the verdict. Scotts disagrees with this characterization, arguing that the objections raised by counsel were treated by this Court as a Rule 50(a) motion.

■ This Court has previously stated that, as a general rule, if a party fails to move for judgment as a matter of law under Rule 50(a) on an issue at the conclusion of all evidence, the party waives the right to file a Rule 50(b) motion. *Shep-*

2. Rule 50 provides, in pertinent part:

**(a) Judgment as a Matter of Law.**
**(1)** If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
**(2)** Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought

and the law and the facts on which the moving party is entitled to the judgment.
**(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.** If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59....
Fed.R.Civ.P. 50(a),(b).

*herd v. Honda of America Mfg., Inc.*, 160 F.Supp.2d 860, 866 (S.D.Ohio 2001).

> The rule serves two purposes: first, it enables the trial court to re-examine the sufficiency of the evidence and, second, it alerts the opposing party to the alleged insufficiency of the case prior to being submitted to the jury. *United States v. Flintco, Inc.*, 143 F.3d 955, 960 (5th Cir.1998). While there is no clear authority from the Sixth Circuit, other courts have taken a broad view as to what constitutes a sufficient predicate for a Rule 50(b) motion. *See* Moore's Federal Practice § 50.40[2] (3d ed.1999). In general, the rule is not rigidly applied if the grounds for a Rule 50(b) motion are closely related to those asserted in the Rule 50(a) motion. *Id.* at § 50.43[3][d].

*Id.* at 866. In addition, preserving a motion under Rule 50 serves to protect a litigant's Seventh Amendment right to trial by jury. *Libbey–Owens Ford Company v. Insurance Co. of North America*, 9 F.3d 422, 426 (6th Cir.1993).

The record in this case reveals that Scotts objected to the submission of the issue of incentive compensation being presented to the jury. The Court noted the objection but overruled it, stating:

> I think there is a serious issue here, and we are going to—frankly, if it's an issue with the verdict, we may have to address it post judgment as to whether or not there is sufficient showing of a contract. That issue may rise again, but at this point it's going to the jury.

(Trial Transcript, April 25, 2002 at 86).

■ The Court concludes that Scotts' objection is sufficient for purposes of a challenge under Rule 50(a). Consequently, the matter was properly raised for purposes of Rule 50. Central's argument that the Court cannot now consider Scott's Rule 59(e) motion, is without merit. Finding no procedural defect, the Court proceeds to consider the substance of the motion.

Scotts argues that it would be manifestly unjust for Central to recover on the incentive compensation claim because the claim was not contained in Central's amended counterclaim, nor was it contained in the Final Pretrial Order. As Central points out, however, the Court permitted an amendment to conform to the evidence under Rule 15(b), which provides:

> **(b) Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Fed.R.Civ.P. 15(b).

■ Consequently, the Court concludes that the absence of Central's claim for incentive compensation from the pre-trial pleadings and Final Pretrial Order is not a basis for precluding Scotts' Rule 59(e) motion.

Scotts argues that Central's recovery of incentive compensation for buy/sell sales is fundamentally inconsistent with the evidence presented at trial regarding Central's product sales during PY 2000. Scotts points out that the jury awarded Central $3.275 million as the net amount due for shipments of Ortho® /Roundup® products to agency customers in PY 2000. This verdict reflects the fact that all of the Ortho®/Roundup® product Central purchased from Scotts in PY 2000 was sent to Scotts' agency customers. According to Scotts, this necessarily means that "Central made *zero* purchases of Ortho®/Roundup® products in PY 2000 for buy-sell business." (*Motion* at 8). Thus, Scotts argues that the $750,000 verdict for incentive compensation on buy-sell sales is manifestly unjust.

Central concedes that shipments to agency customers in PY 2000 exceeded shipments of Ortho®/Roundup® products received by Central from Scotts. Central further concedes that the evidence is undisputed that Central began PY 2000 with $35 million in existing Ortho®/Roundup® inventory, which inventory was used for agency sales. (Testimony of William E. Brown, Trial Transcript at Vol. X, p. 83). According to Central, "[i]t follows, then, that the $15 million in buy/sell Ortho®/Roundup® sales would have come from the Program Year 2000 shipments from Scotts to Central." (*Memorandum contra* at 14). Central fails, however, to point to any evidence in the record that would substantiate this assertion.

■ The Court concludes that the evidence of record is too tenuous to support Central's claim that it is entitled to incentive compensation on a purported $15 million in sales of product on the buy-sell side of the Ortho®/Roundup® business. As Scotts points out and as Central concedes, it had $35 million of product in inventory at the start of PY 2000 which was used to service agency customers. Central's assertion that it had an additional $15 million worth of inventory for buy-sell sales is inconsistent with the evidence of record as to agency sales and, moreover, is unsubstantiated. Although Central relies on Brown's testimony that he believed that $15 million was attributable to buy-sell sales in PY 2000, there is no evidence to substantiate this claim. Further, as Scotts points out, the testimony is inconsistent with majority of evidence which shows that the $35 million in Ortho®/Roundup® product which Central held at the start of PY 2000 was used for agency sales. In sum, the Court concludes that it is manifestly unjust to allow Central to recover $750,000 on the claim of incentive compensation for buy-sell sales. Scotts' motion to set aside this portion of the verdict is meritorious.

## B. Scotts' Motion to Alter or Amend the Judgment to Include Prejudgment Interest and for Awards of Costs and Attorneys' Fees

Scotts seeks an award of prejudgment interest in the amount of $7,938,596.87 pursuant to Ohio Revised Code § 1343.03(A) on the jury's verdict in Scotts' favor. Scotts also seeks an award of costs under Fed.R.Civ.P. 54(d) as a purported prevailing party. Finally, Scotts moves for recovery of attorneys' fees and non-taxable expenses incurred in obtaining payment from Central on past due lawns accounts receivable. Scotts requests that the calculation of such fees and costs be deferred until completion of the appellate phase of this case. The Court will consider each aspect of Scotts' motion, separately.

### 1. Prejudgment Interest

Scotts seeks prejudgment interest on the $22,500,000.00 verdict rendered in its favor. Scotts contends that it is entitled to

prejudgment interest on its claims for breach of contract with respect to PY 2000 invoices from four of Scotts' business units: Gardens, Lawns, Growing Media or Organics, and Horticulture. Scotts relies on R.C. § 1343.03(A) in calculating the sums allegedly due. The statute provides:

> [W]hen money becomes due and payable upon any ... instrument of writing, upon any book account, upon any settlement between the parties, upon all verbal contracts entered into, and upon all judgments, decrees and orders of any judicial tribunal for the payment of money arising out of ... a contract or other transaction, the creditor is entitled to interest at a rate of ten per cent per annum, and no more, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.

R.C. § 1343.03(A).

In Ohio, prejudgment interest under § 1343.03 "acts as compensation and serves ultimately to make the aggrieved party whole." *Royal Electric Constr. Corp. v. Ohio State University*, 73 Ohio St.3d 110, 117, 652 N.E.2d 687 (1995). A party's entitlement to prejudgment interest does not depend on whether the claim is liquidated or unliquidated or whether it is capable of ascertainment prior to a determination by the court. *Id.* at 115, 652 N.E.2d 687. In computing the amount of interest owed, the court is to determine when the claim becomes due and payable and what legal rate of interest should apply. *Id.* "[T]o make the aggrieved party whole, the party should be compensated for the lapse of time between accrual of the claim and judgment." *Id.* at 117, 652 N.E.2d 687.

Before applying these principles, the Court will outline the parties' positions with respect to the claims on which Scotts'

seeks prejudgment interest as well as the rate of interest sought.

### a. Gardens Business

Scotts contends that for the gardens business unit, the 2000 Distributor Price List # 00–1, Exhibit P–17, provides the terms for calculating the interest due. The "Terms" section of the Price List states, *inter alia*, that "[a] service charge of 1½ % per month will be added to the unpaid balance of past due accounts." (Trial Exhibit P–17). Scotts argues that because the Distributor Price List governed Central's purchase of garden products from Scotts in PY 2000, an 18% annual interest rate should be applied to Central's past due account balance on sales from the gardens business.

Scotts relies on the testimony of Peter Supron, Vice–President of Operations Finance for Scotts, that orders placed between December 1999 and April 24, 2000 first came due on May 30, 2000. (April 9, 2002 Trial Transcript at 8–9). Amounts due on gardens orders placed after April 24, 2000 came due at the end of each month or the end of the following month depending on whether the order was placed after the twenty-fifth of a given month, as set forth on the order invoice.

### b. Lawns Business

Scotts argues that for the lawns business unit, the Program Year 2000 National Account Distributor selling program, Exhibit P–389, governs the parties' relationship. The document is, however, silent as to any service charge or late fees for overdue payments on lawns accounts receivable. Nevertheless, Scotts relies on the service charges specified on each individual lawns invoice issued during Program Year 2000 in support of its claim for interest. The individual invoices contain a list of "Terms and Conditions" on the reverse

side. The "Credit" portion of the Terms and Conditions states that "[a] monthly service charge of one and one-half percent (1½) or up to the maximum permitted by law if less, will be payable on any past due portions of the purchase price after the due date." (Exhibit D–2 attached to *Scotts' Motion*). Accordingly, Scotts contends that an 18% annual interest rate applies to Central's past due account balances for the lawns business unit.

### c. Growing Media/Organics and Horticulture

The written distributor programs for the growing media/organics and horticulture business units do not specify any particular service charge or late fee for past due amounts on accounts. The individual invoices for these units are also silent on the issue. Thus, Scotts argues that it is entitled to the ten percent statutory interest rate for past due sums.

Scotts contends that the total amount of interest due is $7,938,596.87. This amount was calculated by Charles Clark, Manager of the Specialist Team in the Customer Service Department of Scotts. During PY 2000, Clark was Accounts Receivables Manager for the Lawns and Growing Media business units at Scotts. In this capacity, Clark was responsible for oversight of accounts receivable, invoices to customers, records of transactions and collection of funds from invoices for collection of the Lawns and Growing Media business units. (*Declaration of Charles C. Clark* at ¶2 attached as Exhibit D to *Scotts' Motion*).

Clark's calculation was derived by identifying all amounts due listed by Scotts on its account statements and unchallenged by Central's expert from the date the amounts were initially due through the date Judgment was entered, May 16, 2002. (*Id.* at ¶10b). Clark applied an 18% annual interest rate on past due accounts for Gardens and Lawns and a statutory rate of 10% interest on past due accounts for Growing Media/Organics and Horticulture. (*Id.* at ¶10c). Clark also calculated offsetting interest in favor of Central to the extent that credits were listed as individual entries in Scotts' account statements and unchallenged by Central. For such credits, interest was calculated from the date of the account statement at an 18% rate for Lawns and Gardens credits and at a 10% rate for Growing Media/Organics and Horticulture credits. (*Id.* at ¶10f). In addition, Clark calculated offsetting interest in favor of Central for credits claimed by Central but not originally listed on Scotts' account statements. Clark calculated interest at a rate of 18% with a start date of December 28, 2001, the earliest date Scotts was informed of specific claimed credits. (*Id.* at ¶10g). The totality of calculations resulted in the amount of $7,938,596.87.

Central challenges the amount sought for two reasons. First, Central contends that it is inappropriate to calculate interest based on the verdict in Scotts' favor. Second, Central argues that the 1½ % per month, or 18% per annum, interest rates are unenforceable for purposes of R.C. § 1343.03(A) because they do not satisfy the requirement of a "written contract supplying a different rate of interest." The Court addresses these challenges separately.

### Baseline amount for interest calculation

Central argues that the Court should first offset the sums due to each party and then calculate prejudgment interest on the net amounts. Central relies on two Ohio Court of Appeals decisions in support of this theory, *Shanker v. Columbus Warehouse, LP*, No. 99AP772, 2000 WL 726876 (Ohio App. June 6, 2000) and *Shinaberry v. Kirshner*, No. L94012, 1995 WL 12143 (Ohio App. Jan. 13, 1995).

In *Shinaberry*, the Ohio Court of Appeals reversed a district court decision that failed to calculate interest based a set off of the parties' debts to each other. The Court held that it is this net resulting award for which the claimant can recover interest because that is "the amount that he was deprived of during the pendency of the litigation." *Shinaberry*, 1995 WL 12143 at *4, citing *L.A. Gross & Sons, Inc. v. Parisi*, 66 Ohio App.3d at 700, 586 N.E.2d 142. Similarly, in *Shanker*, the court calculated prejudgment interest based on a net judgment amount rather than the total award.

Scotts argues that these cases are inapposite to the situation at bar because there are different interest rates and different accrual dates that apply to the respective judgments. Scotts argues that the present situation is akin to that in *McLin v. Leigh*, 74 Ohio App.3d 127, 598 N.E.2d 731 (Montgomery County 1991).

The *McLin* case was, however, decided prior to the Ohio Supreme Court's decision in *Royal Electric, supra,* where the dichotomy between liquidated and unliquidated sums was abandoned. Thus, the Court finds that Scotts' reliance on *McLin v. Leigh* is not entirely helpful. The case does, however, speak about setoff. In particular, the court states that a trial court should "set off the parties' debts to each other as of the first date that each party is indebted to the other." *McLin*, 74 Ohio App.3d at 136, 598 N.E.2d 731. Scotts argues that, under this theory, the Court cannot simply arrive at a net amount owed by each party as of the date of judgment and calculate prejudgment interest based on such figure, because it does not accurately reflect the first date that Central became indebted to Scotts.

■ Scotts' position is well-taken. The Court concludes that the appropriate method for calculating prejudgment interest as to claims resolved in Scotts' favor is

to begin with the amount which the jury awarded Scotts and calculate prejudgment interest thereon. Thereafter, prejudgment interest is to be computed on Central's judgment. A simple offset would improperly ignore the fact that certain portions of the verdict bear differing rates of prejudgment interest. Once the total interest owed on both Scotts' and Central's verdicts is computed, the practical effect of offset then applies, albeit the differing interest rates will continue until the judgment is satisfied.

### Interest rate

Central does not dispute application of a 10% statutory interest rate to the jury's award on the Growing Media/Organics and Horticulture portion of the award. Central does argue, however, that Scotts is not entitled to 18% annual interest on the past due amounts for the Lawns and Gardens portions for two reasons: first, because the terms upon which interest rate is based were not introduced into evidence; and second, because the 18% rate was allegedly not part of a written contract or assented to by Central.

■ The fact that the terms upon which Scotts relies were not introduced into evidence is of no consequence. This Court issued a ruling *in limine* excluding evidence on prejudgment interest at trial since it is not a matter for a jury to consider. Furthermore, invoice statements for the past due accounts, which number in the hundreds, were admitted at trial as exhibits P–001 through P–004.

■ As to the second issue raised by Central, the Court observes that, in order to satisfy the statutory requirement of § 1343.03(A), there must be a written contract between the parties and that document must specify a rate of interest with respect to money that becomes due and payable. *Hobart Brothers Co. v. Welding*

*Supply Service,Inc.,* 21 Ohio App.3d 142, 144, 486 N.E.2d 1229 (Ohio App. 10th Dist. 1985). In *Hobart,* the Court of Appeals held that an "oral statement or a statement on an invoice or bill to which the other party has not assented does not meet the requirement of R.C. § 1343.03(A) as to the existence of a written contract between the parties." *Id.* This holding was applied by the Ohio Court of Appeals in *Yuhanick v. Cooper,* No. 99CO 37, 2001 WL 274545 (Ohio App. 7th Dist. March 14, 2001), a case upon which Central relies in support of its position that an interest rate on an invoice is not a contract for purposes of R.C. § 1343.03.

In *Yuhanick,* the plaintiff and defendant entered into an oral agreement under which Plaintiff was to do construction work for Defendant. As the work progressed, plaintiff submitted invoices to defendant. Defendant paid three invoices and then began to question plaintiff's billing practices. Defendant refused to pay the following three invoices and plaintiff ceased performance. The trial court awarded plaintiff damages of $7,648.16 and prejudgment interest in the amount of $4,589.35. With respect to prejudgment interest, the plaintiff requested that interest be calculated at 24% based upon the rate of monthly interest that appeared on the invoices. The Court of Appeals held that the rate on the invoices did not constitute a written contract for purposes of R.C. § 1343.03(A) because defendant testified that he never assented to the rate. In any event, the court concluded that the issue raised on appeal was moot because the trial court did not use the 24% interest but rather applied the 10% statutory rate.

Central cites additional Ohio caselaw holding that interest rates contained on invoices are insufficient to satisfy the written contract requirement of § 1343.03(A). In *Architectural Interior Products, Inc. v. Alexa Construction,* No. 95CA14, 1996 WL 363551 (Ohio App. 5th Dist. May 16, 1996), plaintiff supplied materials to the defendant construction company for which defendant failed to pay. The trial court entered default judgment in favor of plaintiff. Plaintiff appealed the calculation of interest, arguing that a 2% monthly interest rate that appeared on invoices should have been applied. The Court of Appeals, without elaboration on the issue, held that because there was no written contract between the parties establishing the rate of interest, the 2% rate on the invoices was not enforceable.

Central also relies on the decision in *Cuff's, Inc. v. Clemmons,* No. 66913, 1994 WL 568320 (Ohio App. 8th Dist. October 13, 1994). In that case, Plaintiff Cuff's sold Defendant several items of custom-made men's clothing on a credit account through Shoppers Charge. When Shoppers Charge informed Plaintiff Cuff's that it would extend no additional credit to Defendant, Plaintiff Cuff's paid Shoppers the balance owed and then sought reimbursement from Defendant. The Shoppers Charge account did not have an accompanying written contract. Plaintiff Cuff's continued to make custom clothing for Defendant and when Defendant failed to pay, Cuff's applied a finance charge pursuant to a house account at a rate of eighteen percent per annum. Plaintiff sued Defendant for the amount owed and received a judgment in its favor with prejudgment interest. On appeal, Defendant challenged application of an 18% per annum rate. The Court of Appeals held that there was no evidence of a written agreement between Defendant and Shoppers or between Defendant and Plaintiff Cuff's for an 18% rate. The court further held that the fact that Defendant made some payments on invoices containing the 18% rate did not warrant a variance from the ten percent statutory rate contained in R.C. § 1343.03(A).

Two additional cases which Central cites reach similar conclusions, *i.e.*, that, in the absence of a written agreement between the parties identifying the applicable rate of interest, a higher rate of interest contained on billing invoices is unenforceable for purposes of R.C. § 1343.03(A). *See Olander & Brophy v. Northeastern Pools*, No. CA8219, 1991 WL 6268 (Ohio App. 5th Dist. January 7, 1991); *Kut Kwick Corp. v. North Dixie Parts and Services, Inc.*, No. CA 10678, 1988 WL 38130 (Ohio App. 2nd Dist. April 21, 1988).

This Court rejects Central's assertion that the foregoing authority governs the interest rate issue in this case. First, with respect to past due amounts on Gardens products, the 2000 Distributor Price List # 00-1, Exhibit P-17, is the governing contract which provides the terms for calculating the interest due. The "Terms" section of the Price List states that "[a] service charge of 1½ % per month will be added to the unpaid balance of past due accounts." (Trial Exhibit P-17).

■ The Court concludes that this language satisfies the requirement of R.C. § 1343.03(A) of a "written contract [that] provides a different rate of interest." Scotts sent this document to Central before any shipment occurred. By ordering stock in response to the 2000 Distributor Price List, Central accepted the terms set forth in the document. These circumstances are fundamentally different from the mere sending of an invoice by one party, after at least part performance, which is unilaterally references a higher interest rate than that imposed by Ohio law. Accordingly, Scotts' argument that an 18% annual interest rate should be applied to Central's past due account balance on sales from the gardens business is well-taken.

■ With respect to past due amounts for Lawns products, it is undisputed that the Program Year 2000 National Account Distributor selling program, Exhibit P-389, the contract which governed the parties' relationship, is silent as to any service charge or late fees for overdue payments on lawns accounts receivable. The individual invoices for lawns products contain a list of "Terms and Conditions" on the reverse side. The "Credit" portion of the Terms and Conditions states that "[a] monthly service charge of one and one-half percent (1½) or up to the maximum permitted by law if less, will be payable on any past due portions of the purchase price after the due date." (Exhibit D-2 attached to *Scotts' Motion* ). Central contends that because these terms are not contained in the National Account Distributor selling program and because Central never assented the rate included on the back of each invoice, that the written contract requirement of § 1343.03(A) is not satisfied. The Court agrees. Accordingly, the Court concludes that Plaintiff Scotts is entitled to the 10% statutory interest rate on past due lawns accounts.

In sum, Scotts is entitled to prejudgment interest to be calculated on the $22,500,000.00 verdict in its favor. For past due gardens accounts, Scotts is entitled to an 18% interest rate. For past due lawns accounts, Scotts is entitled to a 10% interest rate. For growing media/organics and horticulture past accounts, Scotts is entitled to a 10% interest rate.

The methodology used by Charles Clark to calculate the applicable rates on Scotts' verdict is sound, other than, in light of the Court's ruling *supra*, on the PY 2000 lawn accounts. Central, however, contests the calculation, arguing that it fails to properly account for credits owed Central by Scotts. Central again urges the Court to use a netting analysis to arrive at the prejudgment interest amount. The Court rejects this analysis but will allow Central to file a supplemental response to Scotts' request

for prejudgment interest in light of the Court's ruling. Scotts' motion for prejudgment interest is granted in part, with the precise amount to be determined, preferably by agreement of the parties, subject to a preservation of the right to appeal the underlying legal determinations made by the Court.

### 2. Costs

Scotts moves pursuant to Rule 54(d) for an award of statutory costs as the purported prevailing party in this case. The rule provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs ...." Fed.R.Civ.P. 54(d). Central concedes that the rule creates a presumption in favor of costs. Central argues, however, that when neither party prevailed completely, costs should be denied.

Central cites *United States Plywood Corp. v. General Plywood Corp.*, 370 F.2d 500 (6th Cir.1966) in support of its position. In that case, the parties had competing claims and counterclaims as to the validity of a patent. The Sixth Circuit held that, in light of the complexity of the issues and because each party prevailed on certain claims, the district court's decision which required each party to pay its own costs was not an abuse of discretion.

Although there is little authority within the Sixth Circuit as to whether costs are appropriate when each party prevails on certain claims, it is clear that this Court enjoys discretion in resolving the matter. *See Jones v. Continental Corp.*, 789 F.2d 1225, 1233 (6th Cir.1986). Furthermore, other courts have held that, while a party need not prevail on all claims to be entitled to costs, *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 713 F.2d 128, 131 (5th Cir.1983), a party may be entitled to costs if it prevails on a "substantial part of the litigation." *See Northbrook Excess and Surplus Ins. Co. v. Procter & Gamble*, 924 F.2d 633, 641 (7th Cir.1991).

■ In the Court's view, although Scotts received a larger verdict than Central, the Court is not inclined to engaged in an analysis of which party prevailed in substantial part. The parties each had legitimate disputes between them and the jury resolved the matter is a manner they deemed appropriate. The Court concludes that an award of costs to one party or the other is not warranted. Each party shall bear its own costs. Plaintiff Scotts' motion for costs under Rule 54(d) is therefore denied.

### 3. Attorneys' Fees

Scotts moves for attorneys' fees based on paragraph 7, entitled "Credit" of the Terms and Conditions found on the reverse side of invoices for sales of Lawns products. The relevant provision states that "the Customer agrees to reimburse and hold Scotts harmless from all damages, costs, collection fees, attorney fees, and other loss or expense which Scotts expends or incurs in obtaining payment." (Exhibit D1 attached to *Scotts' Motion*).

Central argues that the issue of recovery of attorneys' fees pursuant to a contract should have been presented to the jury. Central further argues that, even if the issue is one for the Court to decide, the contractual provision upon which recovery is sought is unenforceable under Ohio law.

Fed.R.Civ.P. 54(d)(2)(A) provides:

Claims for attorneys' fees and related nontaxable expenses shall be made by motion unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial.

■ The general rule in American litigation is that each side pays its own attorneys' fees. Ohio courts follow the "Ameri-

can rule." Thus, in Ohio, attorney fees are generally not recoverable in contract actions unless (1) a statute creates the duty to pay fees, (2) the losing party acted in bad faith, or (3) the parties contract to shift fees. *McConnell v. Hunt Sports Enterprises*, 132 Ohio App.3d 657, 699, 725 N.E.2d 1193 (1999). Scotts argues that the third exception applies in this case and warrants recovery of attorneys fees expended by Scotts in recovering sums owed from Central on the Lawns invoices.[3] Scotts disputes Central's assertion that recovery of fees is a matter that should have been presented to the jury.

The Sixth Circuit has not decided whether a fee provision in a contract is a matter for the judge or the jury to decide. The Court has recognized, however, that there is a split of authority on the issue. *See Clarke v. Mindis Metals, Inc.*, No. 95–5517, 1996 WL 616677 (6th Cir. October 24, 1996).[4] In *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306 (2nd Cir.1993), the Second Circuit held that the jury is to decide whether a party is entitled to recover attorneys' fees pursuant to a contract because the issue is one of common law contract. According to the Second Circuit, the subsequent calculation of amount is an equitable issue for the court to determine. In contrast, federal courts in the Northern District of Illinois hold that the Seventh Amendment does not require that a claim for attorneys' fees pursuant to a contract be presented to the jury because the nature of the claim is more equitable than legal. *See A.G. Becker–Kipnis & Co. v. Letterman Commodities, Inc.*, 553 F.Supp.

118 (N.D.Ill.1982); *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, No. 87C9853, 1990 WL 129595 (N.D.Ill. September 5, 1990).

This Court is persuaded by the latter analysis. Attorneys fees and costs are matters traditionally reserved for court determination. In this Court's view, a contractual fee-shifting provision for reimbursement to a successful party does not change the equitable nature of the relief sought. As Scotts points out, the only prerequisite to recovery of fees evidenced by the language used in paragraph 7 of the Lawns invoice is that Scotts successfully obtain payment on the invoice. The jury in this case found that Scotts was entitled to such recovery. Thus, the Seventh Amendment is not implicated by Scotts' failure to present the attorneys' fees issue to the jury in this case. The Court notes that this is the conclusion reached by at least one other court within this circuit. *See Redshaw Credit Corp. v. Diamond*, 686 F.Supp. 674, 675 (E.D.Tenn.1988) (holding that "the better analysis results in a finding that the determination of attorneys' fees is not properly a jury question where the prevailing party's right to collect the fees arises from a private contract provision."). Consequently, in the Court's view, Scotts' failure to present the attorneys' fees issue to the jury is not an obstacle to recovery.

Central also argues that the contractual fee-shifting provision should be considered void as against the public policy of Ohio. In support of this position, Central cites the

---

3. The Court notes that the issue is narrow— only as to fees incurred in recovering sums on the Lawns accounts. Scotts has not quantified the amount sought in its motion. Thus, the Court only addresses whether Scotts is entitled to fees. The amount recoverable, if any, will have to be determined at a later juncture.

4. This Court notes that Central erroneously cites *Clarke* for the proposition that the jury is to decide whether attorney fees are recoverable under a contract. The Sixth Circuit specifically stated in that case, however, that it "need not decide this issue for the circuit here ... given the parties' stipulation in this case to let the judge resolve the question." *Clarke v. Mindis Metals, Inc.*, 1996 WL 616677 at *8.

Sixth Circuit's decision in *Colonel's Inc. v. Cincinnati Milacron Marketing Co.*, No. 96–1243, 96–1244, 1998 WL 321061 (6th Cir. June 1, 1998) (Norris, J.). That case arose from a dispute over the sale of equipment between two commercial entities. The contract contained the following statement: "Debtor shall pay interest after the scheduled final payment maturity date at the highest lawful contract, at Secured Party's opinion, and will also pay Secured Party's costs of collection and any attorneys' fees, where permitted by law, arising from Debtor's failure of proper payment." *Id.* at *4. The provision was subject to Ohio law. In considering whether an award of attorneys' fees was proper, the Sixth Circuit noted the three exceptions in Ohio to the general rule that fees are not recoverable, as described above. The Court then considered whether the provision was "arrived at through free and understanding negotiation" so as to comport with Ohio law. *Id.*, citing *Worth v. Aetna Casualty and Surety Co.*, 32 Ohio St.3d 238, 242–43, 513 N.E.2d 253 (1987) and *Nottingdale Homeowners' Assoc. v. Darby*, 33 Ohio St.3d 32, 37, 514 N.E.2d 702 (1987).

In analyzing the issue, the Sixth Circuit observed that the Ohio Supreme Court has held that "when a stipulation to pay [attorneys'] fees is incorporated into a contract, it is ordinarily included by the creditor to whom the debt is owed and is in the sole interest of such party. In such circumstances, the promise to pay attorney fees, where not specifically contracted for, was in the [Ohio Supreme Court's] words tantamount to 'legalized extortion ... and against the public policy.'" *Id.*, quoting *State v. Taylor*, 10 Ohio 378, 381 (1841). The Sixth Circuit concluded that while this rule has been revisited by the Ohio Supreme Court, it has not been eviscerated.

In *Worth*, the Ohio Supreme Court held that an employment agreement containing a provision that the corporation employer would pay attorneys' fees incurred by senior executives who sued to enforce the terms of the agreement, was an agreement to indemnify and was not void as against public policy. The Court concluded that the provision was unlike an ordinary contract provision that provides for payment of attorney fees upon default of payment of a debt obligation. The Court stated:

> When a stipulation to pay attorney fees is incorporated into an ordinary contract, lease, note or other debt instrument, it is ordinarily included by the creditor or a similar party to whom the debt is owed and is in the sole interest of such party. In the event of a breach or other default on the underlying obligation, the stipulation to pay attorney fees operates as a penalty to the defaulting party and encourages litigation to establish either a breach of the agreement or a default on the obligation. In those circumstances, the promise to pay counsel fees is not arrived at through free and understanding negotiation.

*Worth*, 32 Ohio St.3d at 242–43, 513 N.E.2d 253.

In *Nottingdale*, the Ohio Supreme Court considered whether a provision in a condominium homeowners' contract that provided for the recovery of attorney fees in any action for foreclosure or collection of delinquent assessments, was enforceable. The court held that it was because when the owners purchased their condominium units the "freely agreed to be bound by the terms of the condominium declaration." *Nottingdale*, 33 Ohio St.3d at 36, 514 N.E.2d 702. Thus, the court held, with little analysis, that such an agreement is not contrary to public policy.

In considering the foregoing, the Sixth Circuit concluded that "[a]lthough *Worth* and *Nottingdale* recognize that where specifically contracted for, attorney provisions

should be enforced, these cases do not change the general common law rule of unenforceability." *Colonel's Inc.,* 1998 WL 321061 at *5. Thus, the Court held that an attorney fee provision on a preprinted contract between two commercial entities "was not the product of specific free and understanding negotiation." *Id.* The Sixth Circuit therefore held that the district court had not erred in concluding that the clause was void as against the public policy of Ohio. *Id.*

■ This Court finds the same holding applicable to the fee-shifting provision contained in the Lawns invoices in the case at bar. The facts in this case are indistinguishable from those in *Colonel's Inc.* While the Court is not bound by an unreported case from the Sixth Circuit, it does find the reasoning persuasive. Scotts' Rule 54(d) motion for attorneys' fees is therefore denied.

## C. Central's Motion for Partial New Trial on Count Ten and for a New Trial on Count Eleven of its Counterclaims

Central moves pursuant to Rule 59 for a partial new trial on Count 10, inventory return for Miracle–Gro® products and for a new trial on Count 11, inventory return for Ortho/Roundup® products. Central contends that there were prejudicial errors of law in this Court's earlier decisions with respect to the claims that warrant relief under Rule 59.

Prior to the commencement of trial, Scotts filed a motion *in limine* seeking to exclude evidence of Central's purported tender of inventory that is the subject of Counts 10 and 11. The counts present claims for Scotts' alleged breach of the oral agency agreement with respect to goods remaining in Central's possession at the end of Program Year 2000. Count 10 alleges that Scotts breached the oral agreement by failing to buy back Miracle–Gro® excess inventory. Count 11 alleges that Scotts breached the oral agreement by failing to buy back Ortho/Roundup® excess inventory.

In its April 4, 2002 *Opinion and Order,* this Court held that the parties' relationship is governed by the UCC, specifically, the provisions on sale or return codified at R.C. §§ 1302.39 and 1302.40. The Court also held that the issues raised by Scotts as to whether the goods sought to be returned were in "substantially their original condition" and whether the purported tender was made "seasonably" for purposes of the UCC, were questions inappropriate for resolution on a motion *in limine.* Scotts renewed its arguments at the close of Defendant's case-in-chief in the context of a Rule 50 for Judgment as a Matter of Law on Counts 10 and 11 of Central's Amended Counterclaim. In a written opinion dated April 24, 2002, this Court considered the issue in the context of the evidence presented at trial.

In its opinion, this Court found sufficient evidence that Central and Scotts had an oral agreement for return of excess product distribution inventory. The evidence was, however, unclear as to the exact parameters of the agreement. Mr. Schwartz testified at trial that the time frame was either consistent with that of earlier agreements or it was 45–60 days. (*Opinion and Order,* Doc. # 192 at 5). The issue before the Court was whether Central had a right to return inventory seven months after Program Year 2000 ended and after the same inventory was already sold. This Court answered the question in the negative.

As this Court earlier observed, R.C. § 1302.40(B)(1) provides for a right of return of goods "substantially in their original condition" if the return is exercised "seasonably." Seasonably is defined as action taken at or within a reasonable period

of time, taking into account the "nature, purpose and circumstances of the action". R.C. § 1301.10(B), (C). The Court found that the undisputed evidence showed that "at the time it proposed a return of goods, [Central] had already acted in a manner inconsistent with any such right [to return] by selling the inventory and giving no notice to Scotts." (*Opinion and Order* Doc. # 192 at 7). This Court further stated:

It is undisputed that Central did not give notice of exercise of its right to return until April 24, 2001 when the Amended Counterclaim was filed. Further, it is undisputed that from the end of Program Year 2000 until the purported notice of return, Central engaged in selling the inventory in its possession. This act is clearly inconsistent with the right to return goods under R.C. § 1302.40. Thus, the Court concludes that Central waived any right it had to return the excess inventory.

Further, the Court concludes that Central's purported notice of tender was clearly not seasonable for purposes of the statute, not only because Central waited until April 2001, but also because the goods at issue had already been sold. Ohio law is clear that in a sale or return, the risk of loss in invoking the right to return is on the buyer. The Court concludes that Central's attempt not to recover damages in lieu of actually returning goods impermissibly circumvents the provisions of R.C. §§ 1302.39 and 1302.40. Although Central argues that it should not have been required to perform a futile act, this argument simply misses the mark—the fact remains that under the law, Central

should not have acted in a manner inconsistent with its right to invoke the right to return excess inventory in the first place. Because the undisputed evidence reveals that Central acted in a manner inconsistent with its rights, it cannot now base an affirmative claim for relief on a purported right of return.

(*Opinion and Order,* Doc. # 192 at 8–9).[5]

In its present Rule 59 motion, Central first argues that, with respect to Miracle–Gro® inventory remaining at the end of Program Year 1999, with a value of approximately $2.9 million, this Court erred in refusing to allow Central to seek damages for that part of the inventory which was sold, as opposed to that which remained in Central's possession at the end of 1999. The jury awarded Central $350,000 for inventory the jury found was subject to a right of return.

Scotts opposes a partial new trial on Count 10 on the basis that Central had the opportunity to present its full loss to the jury but the jury chose to award $350,000. Further, Scotts points out that Central introduced into evidence exhibit P–323, which quantifies Central's damages for loss as to inventory that was offered for return but refused. In addition, Central's expert, Ray Stevens, testified as to Central's loss for inventory offered for return but refused.

Under Rule 59(a)(1), a new trial may be granted on all or part of the issues "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United

---

5. This Court reached a different conclusion with respect to Central's attempts to return Miracle–Gro® inventory in its possession at the end of Program Year 1999. Because there was evidence that Central made attempts to return at the end of 1999 and be-cause the inventory remained in Central's possession, the Court allowed the jury to consider whether a right of return existed and whether the right was exercised in conformity with Ohio law. (*Opinion and Order,* Doc. # 192 at 9–10).

States . . . ." Fed.R.Civ.P. 59(a)(1). Further, Rule 61 provides:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Civ.P. 61.

■ In general, a new trial is warranted if a jury reached a "seriously erroneous result" as evidenced by (1) the verdict being against the weight of the evidence, (2) the damages being excessive, or (3) the trial being unfair to the moving party. *Holmes v. City of Massillon, Ohio,* 78 F.3d 1041, 1045–46 (6th Cir.1996). A substantial error in the admission or rejection of evidence or the giving of or refusal to give a proper jury instruction establishes prejudice. *Id.*

■ The Court finds no error with respect to Central's claims on Count 10 of its Amended Complaint regarding Miracle–Gro® inventory that had been tendered to Scotts, refused, and subsequently sold at the end of Program Year 1999. Central's Exhibit P–323 was introduced to show the loss occasioned by Scott's refusal of the tender for Program Year 1999 Miracle–Gro® inventory. (Trial Transcript, Vol. XII at 23). Further, Central relied on "Dr. Stephens' overall opinion" to show the loss Central suffered by the refusal of tender. (*Id.* at 24). While Dr. Stevens did not break down the exact portion of damage attributable to loss from the Program Year 1999 Miracle–Gro® inventory which

Central sold, when questioned by the Court as to evidence of damages, Central represented to the Court that Dr. Stephen's testimony addressed the issue. (*Id.*). In light of the record, it is clear that Central was not deprived of the opportunity to present evidence as to damages suffered on the Program Year 1999 inventory it sold after tender was refused. Accordingly, the Court finds no "seriously erroneous result" so as to warrant a new trial. Thus, Central's motion for a partial new trial on Count 10 is denied.

Central moves for an entire new trial on Count 11 of its counterclaim, with respect to the sale of Ortho/Roundup® inventory from Program Year 2000. Central argues that this Court erred in granting Scotts' Rule 50 motion. In particular, Central contends that the Court's reliance on the case of *Willoway Nurseries v. Curdes,* No. 98CA007109, 1999 WL 820784 (Ohio App. Oct. 13, 1999) was misplaced because it was unclear in that case whether the court's analysis dealt with a "sale or return" or a "sale on approval" under Ohio law. Central also argues that the Court erred in not allowing the jury to consider whether there was seasonable tender. Finally, Central argues that it had not sold all of its inventory as of April 2001, when tender was made as part of the Amended Counterclaim. Central contends that, although evidence was not presented on the issue, it had inventory in its possession. Central argues that its failure to present evidence was because the Court "gave no indication that there would be any issue to be considered at trial relating to the quantity of inventory that Central had not yet sold." (*Central's Rule 59 Motion* at 16). Scotts opposes Central's motion on the basis that the Court's prior ruling is both legally and factually sound.

The Court concludes its earlier rulings were legally and factually sound. The

Court finds no prejudice to Central in the Court's granting of Scotts' Rule 50 motion. The Court has reviewed its earlier rulings as well as the objections raised by Central in its present motion. First, the legal authorities upon which this Court relied are sound. Second, the Court rejects Central's argument of surprise. The Court's ruling *in limine* plainly stated that it could not resolve the issues surrounding Counts 10 and 11 before trial. Therefore, Central's assertion that this Court somehow foreclosed it from presenting all evidence necessary to create issues of fact on the Ortho/Roundup® right to return claim is simply unfounded. The Court adheres to the analysis set forth in its April 24, 2002 *Opinion and Order* as to this claim. Thus, Central's motion for a new trial on this claim is denied.

## D. Central's Motion for Prejudgment Interest

Central's motion does not seek a specific amount of prejudgment interest on claims on which it succeeded but rather asks the Court to offset any prejudgment interest due Scotts from prejudgment interest to which Central would be entitled. The motion does not, however, present any method for calculating interest on the claims on which Central succeeded.

Procedurally, Central makes its motion under Rule 60 as one for Relief from Judgment. As Scotts points out, the motion was made nineteen days after entry of Judgment in this case, making a Rule 59(e) motion untimely. Central argues that it was not required to file a motion for prejudgment interest under Rule 59(e) because it is entitled to such interest as a matter of law and because any amount it is owed must be netted against any amount due Scotts. Central further argues that by virtue of considering Scotts' Rule 59(e)

motion, this Court has the discretion to consider all prejudgment issues. In addition, Central contends that this Court could consider its request for prejudgment interest under Rule 60(a) or Rule 60(b).

■ The Court concludes that Central's failure to file a Rule 59(e) motion seeking prejudgment interest on claims on which it succeeded is not fatal to the issue of its ability to recover interest.[6] The Court concludes, however, that relief is not appropriate under Rule 60(a), which covers instances of clerical mistake in a Judgment. As Scotts points out, the method for calculating prejudgment interest is subject to some debate between the parties. Thus, it would not simply be a clerical function to correct the Judgment to reflect an amount of interest due Central on the claims on which it prevailed.

■ The Court concludes that it can consider the matter under Rule 60(b). This Court earlier ruled that issues of prejudgment interest would be raised post-trial. Central did not file a separate motion for prejudgment interest for the reasons set forth in opposing Scotts' motion for such an award. Since, however, the Court has rejected the arguments advanced by Central in connection with the prejudgment interest issue, the Court finds that Central is entitled to relief under Rule 60(b)(6) for "any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(6). Central's Motion for Prejudgment Interest is granted.

The parties are directed to confer with each other as to prejudgment interest issues and attempt to arrive at a sum which is in conformity with the Court's rulings in this *Opinion and Order*, subject, of course, to the right to appeal this Court's legal determinations.

---

**6.** Central assumed that the Court would agree with its position on netting of awards prior to

calculating any interest due. The Court has, however, rejected Central's position.

### III.

In light of the foregoing, Plaintiff Scotts' Motion to Alter or Amend the Judgment on Defendant's Claim for Incentive Compensation (Doc. # 196) is **GRANTED;** Plaintiff Scotts' Motion to Alter or Amend the Judgment to include Prejudgment Interest and for Awards of Costs and Fees (Doc. # 197) is **GRANTED in part and DENIED in part;** Defendant Central's Motion for a Partial New Trial on Count Ten and for a New Trial on Count Eleven of its Counterclaims (Doc. # 199) is **DENIED;** Defendant Central's Motion for Prejudgment Interest (Doc. # 200) is **GRANTED.**

The Clerk shall remove the foregoing motions from the Court's pending motions list.

**IT IS SO ORDERED.**